USDC SCAN INDEX SHEET

















CAG   3/1/99   15:16
3:99-MC-00152   LTR ROGATORY BRAGONT V.
*2*
*MEMSUP.*

1  CHARLES G. La BELLA
   United States Attorney
2  STEVE MILLER
   Assistant U.S. Attorney
3  California State Bar No. 138020
   Federal Office Building
4  880 Front Street, Room 6293
   San Diego, California  92101-8893
5  Telephone: (619) 557-5432

6  Attorneys for Plaintiff
   United States of America
7

8

                    UNITED STATES DISTRICT COURT
9
                  SOUTHERN DISTRICT OF CALIFORNIA
10
                                    '99 mc   152
11 IN RE LETTER ROGATORY FROM      )  NO. _____
   POLAND IN THE INVESTIGATION     )
12 OF ALEXEI BRAGONTCHUK           )
                                   )  MEMORANDUM OF LAW IN
                                   )  SUPPORT OF APPLICATION FOR
13                                 )  ORDER APPOINTING COMMISSIONER
                                   )  (28 U.S.C. 1782)
14 _____)

15      This memorandum is submitted in support of the application of the

16 United States for an order requiring persons within the jurisdiction

17 of this Court to provide testimony and evidence requested by the

18 Provincial Prosecutor's Office for use in a criminal proceeding in

19 Warsaw, Poland, and appointing a commissioner to collect it.   The

20 application is based upon the attached letter rogatory.

21      As set forth in the letter rogatory, the Provincial Prosecutor's

22 Office has commenced a criminal investigation in Warsaw, Poland.   The

23 Commissioner would be required to subpoena witnesses and compel the

24 production of documents that are within the jurisdiction of this Court

25 and are necessary for a money laundering investigation that is being

26 conducted in Poland.

27 / / /

28 / / /

SFM:prf:N:\UDD\PFILIPEL\POLAND.COM\BRAGONTC.MOL
(revised 2/19/99)

1    The letter of request states that the Provincial Prosecutor's
2  Office of Warsaw, Poland, is investigating Alexei Bragontchuk and
3  other individuals in connection with fraud charges that relate to the
4  laundering of money that were known to be proceeds of weapons
5  trafficking.  During the relevant time period, the Polish authorities
6  linked funds from the targets of the investigation to a company called
7  "Teasdale."  Money from the "Teasdale" company was transferred to Pro
8  Systems International located at 3565 Caminito El Rincon, San Diego,
9  California 92130. Those proceeds were deposited into a Wells Fargo
10  Bank account at Del Mar Highlands, 3445 Del Mar Heights Road, San
11  Diego, California.  The letter rogatory from the Polish Provincial
12  Prosecutor's Office only lists the company at 3565 Caminito El Rincon
13  as the "International Inc."  A computerized records check reveals
14  that the business at 3565 Caminito El Rincon is incorporated as "Pro
15  Systems International."  "Pro Systems International" was incorporated
16  on July 16, 1997, with the mailing address and registered office of
17  3565 Caminito El Rincon, Suite 209, San Diego, CA 92130.   The
18  registered agent is "Mike Avergun."  The president is Efim Fishman of
19  14 Florida, Kishinev, Moldova.  The letter rogatory from the Polish
20  authorities show that Alexei Bragontchuk is a resident of Moldova.

21    "Mike Avergun's" true name is "Mikhail Avergun."  Mikhail Avergun
22  purchased 3565 Caminito El Rincon, Unit 209, San Diego, CA 92130 on
23  April 29, 1996, from the Pardee Construction Company.  Mikhail Avergun
24  sold 3565 Caminito El Rincon, Unit 209, San Diego, CA 92130 on
25  November 3, 1998, to Lois Daris.

26    Mikhail Avergun filed two fictitious business names.  On June 27,
27  1995, the name "PSI Company" (Pro Systems International) with a
28  business address of 4085 Nobel Dr., Apt 18, San Diego, CA 92122-5871

2

1 was filed.  The owners are listed as Efim Fishman, Mikhail Avergun,
2 and Mike Roytman.  On October 3, 1994, the name "USA & Russia" with
3 a business address of 4085 Nobel Dr., Apt 11, San Diego, CA 92122-5876
4 was filed.

5 The Polish authorities are requesting that a subpoena be issued
6 for the production of all documents related and pertinent to the
7 account to which the money was deposited.  The documents should
8 include: (1) all the Wells Fargo accounts used by Pro Systems
9 International, PSI, PSI Company, Mikhail Avergun, Mike Avergun, Efim
10 Fishman, Mike Roytman, Mikhail Roytman or any business doing business
11 as "USA & Russia;" (2) the names of the persons who opened the account
12 and are authorized to withdraw money or issue checks on the accounts;
13 (3) copies of bank account statements; (4) copies of checks; and, (5)
14 copies of the application form and signature cards to the accounts.

15 A.   <u>AUTHORITY TO GRANT A FOREIGN REQUEST FOR ASSISTANCE</u>

16 Title 28 U.S.C., Section 1782, provides in pertinent part that:

17      The district court of the district in which
       a person resides or is found may order him to
18     give his testimony or statement or to produce a
       document or other thing for use in a proceeding
19     in a foreign . . . tribunal.  The order may
       be made pursuant to a letter rogatory issued, or
20     request made, by a foreign . . . tribunal or
       upon the application of any interested person
21     . . . .

22 Section 1782 was enacted:

23      to improve United States judicial procedures for
       . . . obtaining evidence in the United States in
24     connection with proceedings before foreign and
       international tribunals . . . .
25
Sen. Rep. No. 1580, 88th Cong., 2d Sess. 1 (1964), <u>reprinted in</u> 1964
26
U.S. Code Cong. & Admin. News 3782 [hereinafter <u>1964 U.S.C.C.A.N.</u>].
27
By enacting Section 1782, Congress reaffirmed the inherent authority
28
of district courts to grant foreign judicial assistance.  <u>In re</u>

3

1 Request for Assistance from Ministry of Legal Affairs of Trinidad and

2 Tobago, 648 F. Supp. 464 (S.D.Fla. 1986), aff'd, 848 F.2d 1151, 1154

3 (11th Cir. 1988), cert. denied, 488 U.S. 1005 (1989) [hereinafter

4 Trinidad and Tobago, 467]. More significantly, its enactment

5 reflected Congress' desire to **increase** the power of district courts

6 to respond to foreign requests for judicial assistance. In re Letters

7 Rogatory from the Tokyo District, Tokyo, Japan, 539 F.2d 1216, 1218

8 (9th Cir. 1976) [hereinafter Japan I]. In sum, Section 1782 is a

9 Congressional invitation to district courts to affirmatively act to

10 execute foreign requests for judicial assistance.

11          1.    Source of the foreign request for assistance

12     Foreign requests for judicial assistance may be made by a foreign

13 court or tribunal, including an investigating magistrate or judge's

14 instruction. In re Letter of Request from the Government of France,

15 139 F.R.D. 588, 590-591 (S.D.N.Y. 1991) [hereinafter France]; In re

16 Letter of Request for Judicial Assistance from the Tribunal Civil de

17 Port-Au-Prince, Republic of Haiti, 669 F. Supp. 403, 405-406 (S.D.Fla.

18 1987) [hereinafter Haiti]. Foreign requests may also be made by "any

19 interested person," such as a foreign legal affairs minister or public

20 prosecutor. In re: Letters Rogatory from the Tokyo District

21 Prosecutor's Office, Tokyo, Japan, 16 F.3d. 1016, 1019 (9th Cir. 1994)

22 [hereinafter Japan II]; In re Letter of Request from the Crown

23 Prosecution Service of the United Kingdom, 870 F.2d 686, 690 (D.C.

24 Cir. 1989) [hereinafter United Kingdom]; Trinidad and Tobago, 648

25 F.Supp. at 466-67.

26          2.    Purpose for the foreign request for assistance

27     Foreign requests for judicial assistance must be for the purpose

28 of securing evidence "for use in a proceeding in a foreign . . .

4

tribunal."   This includes evidence needed in proceedings before investigating magistrates as well as in proceedings before conventional courts.  1964 U.S.C.C.A.N. at 3788;  Haiti, 669 F. Supp at 405-406.   Section 1782 contemplates that district courts will facilitate evidence gathering prior to litigation; Congress amended Section 1782 to eliminate the need for a "pending" proceeding with the intention of expanding the availability of U.S. judicial procedures for obtaining evidence in the United States in connection with proceedings before foreign tribunals.  Even so, where no proceeding before a foreign tribunal is currently pending, district courts should consider whether a proceeding can reasonably be expected to commence. As Judge (now Justice) Ginsburg explained:

> [T]o guard against abuse of section 1782, the district court must insist on reliable indications of the likelihood that proceedings will be instituted within a reasonable time.

United Kingdom, 870 F.2d at 692.

###   B.   AUTHORITY TO APPOINT A COMMISSIONER

Section 1782 further provides in pertinent part that:

> The district court . . . may direct that the testimony or statement [of a person who resides or is found within the district] be given or the document or other thing be produced, before a person appointed by the court.

A district court customarily appoints or "commissions" a person or "commissioner" to collect evidence on behalf of the district court and authorizes the commissioner to submit the evidence collected to the requesting foreign court or authority.   With requests for assistance in criminal matters, a district court typically appoints an Assistant United States Attorney as commissioner.   However, a district court also may commission a foreign authority together with (or in lieu of) an Assistant United States Attorney.  See, e.g., In

re Letter of Request from the Supreme Court of Hong Kong, 138 F.R.D. 27, 29 (S.D.N.Y. 1991) [hereinafter Hong Kong].

Application to a district court for appointment of a commissioner to execute a foreign request for judicial assistance is handled ex parte. United Kingdom, 870 F.2d at 688; Japan I, 539 F.2d at 1219.

### C. AUTHORITY TO ESTABLISH THE EVIDENCE-COLLECTING PROCEDURE

Section 1782 further provides in pertinent part that:

> To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

A district court empowers a commissioner to collect the evidence using the procedure prescribed by the court. A district court has "complete discretion in prescribing the procedure to be followed." 1964 U.S.C.C.A.N. at 3789. When a district court's order fails to specify a procedure by which a commissioner is to collect the evidence, the Federal Rules of Civil Procedure apply. Japan II, 16 F.3d. at 1019-1020; Hong Kong, 138 F.R.D. at 32. However, as Section 1782 makes clear, when a district court does specify a procedure other than one in accordance with the Federal Rules of Civil Procedure, the alternative procedure shall apply. France, 139 F.R.D. at 590-591.

### 1. Commissioner's subpoena

If a district court so orders, a commissioner may use the attached form, entitled commissioner's subpoena, to obtain the requested evidence. See, e.g., United States v. In re Erato, 2 F.3d 11, 12-13 (2d Cir. 1993) (incorporating in pertinent part the district court's order directing the use of

6

1  commissioner's subpoenas).  The commissioner's subpoena is a
2  creation of neither the Federal Rules of Criminal Procedure nor
3  the Federal Rules of Civil Procedure, but is an order of the
4  district court for the production of evidence in accordance
5  with Section 1782.  See 28 U.S.C. 1651.  Upon authorization by
6  a district court, a commissioner may issue such commissioner's
7  subpoenas as are necessary to execute the request in the
8  relevant district.

9       2.  Notice of evidence taking

10      If a district court so orders, a commissioner may collect
11  the evidence in accordance with procedures -- including those
12  involving notice -- requested by the requesting court or
13  authority.  In the absence of a request for a specific
14  procedure, a district court can assume that the requesting
15  court or authority has provided such notice as the foreign law
16  requires, or that the foreign law does not require notice and
17  the requesting court or authority does not consider notice to
18  be necessary or useful.  In sum, if the requesting state has
19  not requested notice, no notice need be provided.  Accordingly,
20  to the extent that a request does not ask for specific notice
21  procedures, a district court should authorize a commissioner to
22  take the evidence without notice to any party other than the
23  recipient of the commissioner's subpoena.

24      Based upon the facts set forth in the letter rogatory from
25  the Provincial Prosecutor's Office of Warsaw, Poland, the
26  request is clearly one contemplated by Congress when, in
27  enacting Section 1782, it expanded the authority of federal
28  courts to assist foreign tribunals.

1    Congress intended that the United States set an example to
2  other nations by making judicial assistance generously
3  available.   Trinidad and Tobago, 848 F.2d at 1153-54.
4  Accordingly, the government asks this Court, in the interests
5  of comity, to issue the attached order under Section 1782
6  granting assistance for a proceeding in Poland, appointing
7  Assistant United States Attorney Steve Miller as commissioner,
8  and authorizing him to take the actions necessary, including
9  the issuance of commissioner's subpoenas, to collect the
10 evidence requested and to adopt such procedures in the receipt
11 of the evidence as are consistent with the intended use thereof
12 in Poland.

                          Respectfully submitted,

                          CHARLES G.   LA BELLA
                          UNITED STATES ATTORNEY


                     By:  _Steve Miller_____
                          STEVE MILLER
                          Assistant United States Attorney

8

Warsaw, 12th Feb. 1998

(Seal)

Provincial Prosecutor's Office

in Warsaw

Dept. VI Organized Crime

Krakowskie Przedmieście St. 25

00-951 Warsaw

VI Ds 61/97

## Request

### for legal assistance in a criminal matter

The Provincial Prosecutor's Office in Warsaw has been conducting since 21st May 1997 investigation in the case of money laundering with the mediation of Polish banks in amount of at least USD 6,000,000, that may have come from weapon or armament trade, that is an offense described in Art. 5 §1 of the Act "Protection of the economical turnover" of 12th Oct. 1994 (Official Journal of Acts No. 126, pos. 615).

In the process of the penal proceedings the following facts were established:



{

In December 1996 the Bank for Food Economy SA (BGŻ) in Warsaw, Dept. of Control and Supervision, reported at the Provincial Prosecutor's Office in Warsaw the realization of a transfer to the account "C" of Alexei Bragontchuk, of the amount of 3,500,000 USD from the Banco Exterior de Espana in London through the Bank of America International New York.

Alexei Bragontchuk is a citizen of the Community of Independent States, resident according to data in his pass and statements of bank documents, in Kishiniov, Republic of Moldavia.

On 30th Sept. 1996 the Moldavian citizen Alexei Bragontchuk opened in the Polish Bank for Food economy in Warsaw the account "C", that is an account for physical persons with the minimum deposit of 500 USD. Bragontchuk does not have in Poland neither permanent nor temporary place of residence and does not conduct in Poland any official business.



On 10th Oct. 1996 to the account of Alexei Bragontchuk came the in amount of 500,000 USD, transferred telegraphically from the company "Intora Ltd." through the Banco Exterior de Espana in

2

Ventures Ltd." in the Central European Bank in Budapest.

In cash Bragontchuk brought outside Poland on 11th July 1997 the amount of 1,230,000 USD.

To Poland Alexei Bragontchuk came only for the period of time needed for execution of bank actions, his stay lasted always one day.

On 27th March 1997 Bragontchuk filed a request at the Bank, where he corrected the spelling of his name, that should sound from then on: "Alexei Braganciuc", born on 26th June 1960, son of Mikhail.

Braganciuc made also a disposition to transfer money to the bank in Moldavia through the Chase Manhattan Bank Brooklyn New York.

In the Bank for Food Economy SA in Warsaw its account has also the company "Teasdale Ltd.", registered in Dublin. This company runs no business in Poland and as it results from the till-now establishments of the investigation, it has neither its office nor any seat.

Of the bank accounts of the company "Teasdale" in Poland dispose: the appointed proxy, Jacek Wypych, having his residence in Poland and a



4

permanent stay permit in the USA, and Marian Piszcz, citizen of Poland, residing in Poland.

The element that connected Alexei Braganciuc and "Teasdale" in the investigation was the fact that on 15th Oct. 1996 to the account of "Teasdale" in the Bank for Food Economy came amounts of 816,000 USD from "Intora Ltd." and on 19th June 1997 3,328,936 USD, also from the company "Intora Ltd."

"Teasdale" runs no business in Poland, but has several bank accounts, where financial assets are transferred.

The company "Intora Ltd." according to official documents was registered on 1st Nov. 1994 in England, register No. 02985086.

The ultimate holding company for the "Intora" is the Consolidated International Holdings, registered in Panama. About the holding in Panama we know nothing except the fact, that "Intora Treves Association" carried out a money transfer in amount of 1,344,980 USD to the account of the "Teasdale" in a Polish bank.

"Intora Treves Association" is a holding company registered in Panama.



5

"Intora Ltd." is registered in England by the Companies House, 2nd Floor Romy House 159-167 King Road Brentwood, Essex.

Directors of the "Intora Ltd." in Great Britain are Nicholas Sellars, Peter Jeney – a citizen of Switzerland, and Brian Charles Nalborough, Milivoy Relijn – a citizen of Yugoslavia.

Altogether since 9th Oct. 1996, by the order of the company "Intora Ltd." in England, to accounts of the company "Teasdale" in Poland, of the company "Transmoss" and of the Moldavian citizen Alexei Braganciuc, the total amount of at least 5,718,958 USD was transferred.

This is the amount of orders to accounts in just one bank – Bank for Food Economy.

The company "Intora Ltd." deals probably with weapon trade on the international basis. There arises a fully justified suspicion that the purpose of money transfer orders of "Intora" to Polish banks is the money laundering.



Because in order to convict to certain persons the participation in money laundering, it is necessary

6

to document the origin of financial assets – for example from the weapon trade – inevitable is to establish the sources of origin of the financial assets of the "Intora" and to establish the organization of the criminal business in the purpose of indicating the decision center.

From establishments of the investigation it results that the mechanism of dealings looks as follows: the financial assets sent to Poland go to accounts of persons or companies that run no economic business in Poland, but dispose of bank accounts of those companies.

Then these assets are subject of multiple transfers among other bank accounts of foreign companies, that have only their bank accounts in Poland, and then they are transferred back abroad under various pretexts, if in general the title of payment is indicated.

Transfers between foreign companies, mentioned below, have no logical economic grounds, no economic reason. They look as typical money laundering mechanism.



7

Companies, between which financial assets sent by "Intora" are transferred to Poland and from Poland abroad, are:

- AMRON Ltd. – registered in 1992 in USA, seat: Paul Podedworny, 417 Huber Lane Glenview I11 60025, Bank American National;

- Banner AG – registered in 1992 in Vaduz, Liechtenstein, Alute Str. 5 FL-8490. Owner of the account in the Polish bank is Jacek Wypych, and Marian Piszcz is the proxy;

- Teasdale Ltd. – registered in 1995 in Dublin, Ireland, seat: 41 Central Chambers Dame Court Dublin 2. No data of the bank in England or Ireland. Of bank accounts of the company in Poland disposes the proxy, Jacek Wypych;

- Tranmoss – founded in Ireland in 1996. Of the account in Poland dispose Henryk Chmielewski and Marian Piszcz;

- Concors Inc. – registered in 1996 on the Virgin Islands, Tortola Palm Chambers.





We would like to know, if the a.m. companies run any business on the territory of the USA, and if so, what do they deal with and in what bank do they have their accounts.

We request for determining of the kind and purpose of mutual financial and personal relations of these companies with the company "Intora Ltd."

The said establishments may deliver facts of great importance, documenting the origin of considerable assets that always are present on all accounts, always in the currency of the US Dollars. We also hope, that the requested establishments shall allow indication of the owner of the laundered money.

And so we hereby request for executing of the following actions and establishments and forwarding of the following documents:

1. From the preliminary information achieved from the FBI Liaison Office in Warsaw we know, that in the USA two companies named "Intora" were registered, which currently are no more active. There arises a justified suspicion, resulting from coincidence of names, dates and places of



9

location, that the "Intora Ltd." in England or the holding "Intora" in Panama dispose of the very same financial assets, that belonged and in some way vanished - because of some tax frauds - from the "Intora" in the USA.

1. Intora SA Inc.

   350 Lincoln Rd, Suite 501

   Miami, Florida 33139

   The founding person was allegedly Rochelle Mea Malek.

   The company was allegedly liquidated on 16th Nov. 1987.

1. Intora Holdings Inc. State of Texas

   since 14th Feb. 1995 the status of the company is "dead" because of confiscation for unpaid taxes.

   The legal representatives of this company were Bailey, Shaw and Deadman, PC 314 East Commerce, Suite 400, San Antonio, Texas 78205.

   Person registering the company: Marilyn S. Hershman, Austin, Texas, USA.



10

We request for forwarding of the following documents in relation to both "Intora" companies, running business in the USA:

- Excerpt from the Companies Register, data of the company capital, shareholders, employees and object of business and causes of liquidation of the "Intora SA Inc", liquidated on 16th Nov. 1987. In what banks did the company run accounts, and are these accounts at present liquidated or do they still exist as active;

- Register documents of the company "Intora Holdings Inc.", active till 14th Feb. 1995 in Texas, its statute, list of shareholders and object of business and reason for its confiscating by the authorities. Was the IRS satisfied by the confiscation of the company's property or was it, that some capital "vanished", for example skillfully hidden outside the USA? What was the amount of the liabilities?

It cannot be excluded that not coincidentally emerged the fact, that some money transfers of the "Intora Ltd." in Great Britain, after being



[ ]

transferred to Poland to accounts of the said companies, go back abroad at once, therein also to the USA, to banks in Texas, Florida, Illinois and New York.

1. In June 1997, by the order of the company "Concors Inc.", realized by its proxy Marian Piszcz, the sum of 32,035 USD was transferred to the account No. 622-176-9 Fields Infiniti 3 Waukegan Rd. Glenview I11. 60025 USA in the Harris Bank Winnetka N.A. 520 Green Bay Rd. Winnetka, IL. 60093 USA;

2. In July 1997 the "Concors Inc." orders that transfer of 25,000 USD to the account No. 36035155846 L.O.A. Investments 2 Clearview Av. Hobe Sound, Fl.33455 in the Nations Bank 5519 Idelwild Av. Tampa, FL 33614 (allegedly for a computer program);

3. "Banner AG" orders a transfer of 136,000 USD in September 1997 for the "Amron Ltd." to the account in the Bloomingdale Bank 150 S. Bloomingdale Rd. Bloomingdale IL. 60108 USA ABA 071-



12

925-305 (disposed Marian Piszcz from the AmerBank) and of 98,000 USD in October 1997, 124,000 USD;

4. The company "Banner AG" orders the transfer of 5,000 USD from the account in the AmerBank for Agata Podedworny, Bank of New York, 233 Broadway New York, N.Y. 10279 ABA-021-000-018, account No. 6371539334 – disposition of Marian Piszcz;

5. from the company "Teasdale" considerable assets were transferred for the International Inc. 3565 Caminito El Rincon, San Diego CA. 92-130 to the Wells Fabg Bank Del Mar Highlands 3445 Del Mar Heights Rd. What does the owner of this account deal with, does this company exist and does it have any connections with the "Intora" and others?

6. In July 1997 the "Concors Inc." – order realized by Marian Piszcz, the amount of 10,000 USD transferred to the account No. 1024277 Fenton Lang Residential Services in the First United Bank 980 N.



13

Federal Highway, Boca Raton FL 33432

ABA 067013153 (as a commission from a

real estate purchase)


We also request for answers to the following

questions:

- Does the company mentioned in p. 6 deal

   with real estate trade and does it still

   exist?

- What do the addressees do of the

   transfers from the company "Concors Inc.",

   described above in points 1-5, are these

   companies – acting – or private persons,

   who personally disposes of these

   accounts, and first of all if anyone took this

   money in cash – if so, who?

- If in the a.m. banks in the states of Illinois,

   Florida have ever had – or still have – their

   bank account(s) the following companies:

   AMRON

   CONCORS

   TRANMOSS

   BANNER

   TEASDALE



14

INTORA

INVESTMENTS GROUP INC.

ASTON ROTHBURY CREDIT CORP.

HOMER

ASTON TOTHBURY AND CO. LTD.

MEDITERRANEAN VILLAS LTD.

GILMOUR

- If the bank account of Agata Podedworny is her private account or a company account, and if so, to whom does it belong?

2. If in American banks, such as:

CHASE MANHATTAN BANK BROOKLYN NY

BANK OF AMERICA

AMERICAN EXPRESS BANK

BANK BLOOMINGDALE

AMERICAN NATIONAL BANK

or on the Paradise or Bahamas Islands,

the following companies or physical persons have

their bank accounts:

- AMRON Ltd. – an American company. Owners are Paweł Podedworny, res. 417 Huber Lane Glenview IL 60025 USA, and



15

Wiesław Michalczyk, res. 438 Sheryl Ln Glenview IL, and Jacek Wypych, empolyee of the "Amron", res. in Poland, Łódź, ul. Żurawia 12/27, and in the USA;

- BELTECHEXPORT – a company registered in Minsk in Bielarus, with a Branch Office in Poland. Financial Proxy of this Branch Office for Poland is Jacek Wypych;

- TRANMOSS Ltd. – registered in Dublin, Ireland

- BANNER AG – registered in Vaduz, Liechtenstein, by Wiesław Michalczyk and Jacek Wypych;

- CONCORS Inc. – Virgin Islands;

- INVESTMENTS GROUP Inc. USA, Bahamas;

- TEASDALE INC. – Dublin, Ireland;

- EB SHiPPiNG LTD.;

- GILMOUR;

- ASTON ROTHBURY CREDIT CORP. LTD.;

- HOMER LTD.;

- PANDORA VENTURES – Virgin Islands;

- ASTON TOTHBURY and Co. Ltd.;

- MEDITERRANEAN VILLAS LTD.;



16

- INTORA LTD. or INTORA TREVES ASSOCIATION;

- Jacek Wypych;

- Alexei Braganciuc;

- Lew Kozlov;

- Petar Stojic;

- Mima Jovanovic;

- Miloslaw Reljin;

- Hashem Maadi;

- Paweł Podedworny;

- Wiesław Michalczyk;

- Marian Piszcz;

- Henryk Chmielewski;

- Petfiew Aleksander.

3. Who is the Managing Director in USA of the Branch Office of the "Intora Ltd.", having its seat in the state of Texas, 2509 Shoreline Drive, Abilene, Texas 79602?

Interview please the manager of the Branch Office of "Intora" as to:

- What activity runs the "Intora" in the USA, what is the purpose of existence of the Branch Office?



17

- What are the sources of financing of the "Intora Ltd." Branch Office in Texas, and who gives orders to this person in the name of the company?

- Where has its location the office of the management of the "Intora Ltd."?

- Does this person get cash for running the Branch Office or assets on the bank account and from what persons?

- Who is an employee of "Intora" in the USA?

4. Interview please as a witness Ms Marilyn S. Hershman from Austin in Texas and Ms Rochelle Bea Malek from Florida, who both registered their companies with the same name "Intora" as to:

- When and by what reason did they found a company named "Intora"?

- What was the purpose and object of the company's business?

- How long was the company active?

- What was the company capital, where did it come from and from whom, who was the shareholder or stockholder and owner of the company?

- Why is the company not active any more?



18

- Is it possible for the company to re-open business, what debt does it have against the IRS or against other parties?

- What gains and profits did the company achieve?

- Did they co-operate with partners in Europe in their business?

Please interview as a witness Mr. Ron Rochester, bank clerk conducting the bank account of the company "Amron" in the American National Bank 4159 Old River Rd., Schiller Park, ILL 60176, as to

- Since when has "Amron" had its account in the American National Bank?

- What is the yearly turnover on this account, does this company maintain its credit liquidity?

- What are the sources of "Amron's" income, what business does it run?

- Does "Amron" have any other bank accounts, does it have Branch Offices, where?

- From what countries, companies or private persons did the transfers come, were there



19

any transfers from "Intora", if so, secure the documentation.

- Has "Amron" transferred any financial assets outside the USA or mutually between companies, having accounts in American banks?

- Who personally disposes of the account of "Amron", who gives the bank orders?

- Are these persons the owners of the company or employees?

- With what capital did the account start its existence? We need the origin of two first pay-ins and analysis of the history of the "Amron" account, in particular for the years 1995, 1996-97.

- Does Mr. Ron Rochester know, in what banks and how many bank accounts does "Amron" have in Poland? Has he presented the financial standing of the company for Polish banks?

- Have there been any transfers from the companies Banner, Teasdale, Tranmoss, Concors, Intora, Pandora, and if so, from what accounts?



26

Moreover we request for establishing, where the office of the "Amron Ltd." is located and who is the employee of this company.

We request for securing copies of protocols of meetings of the Board or of another document of the company, where "Amron" appoints proxies for disposing of bank accounts of the company in the USA, in Poland and other countries.

Check please, if it results from the documents, that the company's employees get remuneration for their work. Secure copies of documents, from which it results who gets a remuneration of an employee of the "Amron".

How many Branch Offices does "Amron" have and in what countries?

In what companies all over the world did "Amron" invest by purchasing shares?

5. Establishments requested by us are to lead us not only to clarification of Intor's money origin, but also to trace the way covered by the money, in order to prove who receives from Poland and makes use of the laundered money.



21

Jacek Wypych takes cash from Polish accounts of companies already mentioned in our request, and brings it also outside Poland as cash.

He brings cash (e.g. 488,000 USD from "Intora" in London for an unidentified recipient recipient. Outside his Polish residence Jacek Wypych lives in the USA, he often comes to Chicago and from there he travels to the Paradise Islands.

We request for establishing, if he locates there the financial assets on accounts of the companies: "Tranmoss", "Intora", "Teasdale", "Amron", "Concors", "Banner", Beltechexport" or an account of his own. It is also probable, that Jacek Wypych has a company of his own on the Paradise Islands.

The amount of five million USD, which is at present subject of the preparatory proceedings, is a very small part of the turnover, that in fact takes place with the use of the above described mechanism, consisting in transferring money to accounts of companies in Polish banks by "Intora" and others, and then transferring them between those companies and various accounts in various



22

Polish banks. Then the money goes back abroad, as transfer or in cash (mostly as 100,000 till 500,000 USD) by physical persons that are appointed as proxies of those companies.

The real dimension of this procedure has already exceeded the point of 15,000,000 USD.

We request for establishing, if the below mentioned persons crossed the USA border in the years 1989-1997 and if there are between them any connections – subjective or objective – in relation to the economic business of the said companies, and who of those persons has the right of permanent stay in the USA – do they have the insurance in the USA:

1. Jacek Wypych – res. in Poland and in the USA; recently 140 Boardwalk Park Ridge I1 60068, born on 23rd Feb. 1951 in Łódź, son of Waldemar and Irena;

2. Paweł Podedworny – born on 7th Aug. 1950 in Warsaw, son of Henryk and Stefania, permanent stay in the USA. Polish pass No. AA 6765606, American pass No. 023284683;



23

3. Wiesław Michalczyk – born on 2nd Apr. 1959 in Warsaw, son of Stanisław and Marianna, permanent stay in the USA. Polsh pass No. AA 4487674, American pass No. 24907425;

4. Peter Jeney – born on 13th Sept. 1940, Swiss citizen;

5. Henryk Chmielewski – res. in Poland, Kalisz, born on 13th June 1928 in Kalisz, son of Michał and Aleksandra;

6. Marian Piszcz – born on 30th Oct. 1955 in Mińsk Mazowiecki, son of Marian and Władysława;

7. Zbigniew Tolak – born on 16th Dec. 1951 in Warsaw;

8. Charles Nalborough – citizen of the Great Britain, Director of "Intora Ltd.";

9. Alexei Bragontchuk or Braganciuc – born on 26th June 1960 – citizen of Moldavia.



We also request for establishing, what economic or professional activity conduct Agata and Paweł Podedworny and Wiesław Michalczyk, in particular what are their shown-up incomes, from

$24$

which they pay taxes, and what is their source, are they employed in American companies?

We applied for legal assistance to authorities of the Great Britain and before execution of the planned, requested actions in the way of the legal assistance in the Great Britain it is not possible to precise the conclusions as to interviews of Wiesław Michalczyk and Paweł Podedworny. Absolutely certainly their interviews shall be necessary and it can not be excluded that it shall take place in the USA. Nevertheless now, because of investigation tactics, it is not possible to decide as to the form, time and range of the interviews of Wiesław Michalczyk and Paweł Podedworny.

Wiesław Michalczyk and Paweł Podedworny have in Poland their places of registered residence and they travel to Poland and other countries making use of their passports Polish and American.

In the same time we request for allowing participation in actions of the Polish prosecutor.

Persons interviewed as witnesses should be instructed that according to the contents of Art. 247 §1 of the Polish Penal Code, filing false statements



25

and concealing the truth is an offense endangered with liability to imprisonment till 5 years.

Enclosed are regulations of the Polish Penal Code, Penal Proceedings Code, of the Act "Protection of the economical turnover" and alteration of some provisions of the Penal Law of 12th Oct. 1994 (Official Journal of Acts, No. 126 of 1994).

With best regards

(Seal)

Deputy Provincial Prosecutor

in Warsaw

(-)

Zbigniew Goszczyński, M.Sc.

(Round seal)

Provincial Prosecutor's Office

in Warsaw



26

(Seal)

Provincial Prosecutor's Office

in Warsaw

Dept. VI Organized Crime

Krakowskie Przedmieście St. 25

00-951 Warsaw


Enclosure No. 1

A. Regulations of the Polish Penal Code

Art. 247

§1

Whoever, making a testimony that is to become an evidence in a Court Proceeding or in another proceeding, conducted on the basis of an Act of Law, testifies untruth or hides the truth

      is liable to imprisonment to 5 years.


§2

The liability is conditioned, that the interviewing, acting within the range of his authority, instructs the interviewed of the penal liability for false statement or takes a promise from him.



A

§3

Is not liable to punishment, who without knowing of the right of refusal or answering questions, files false statements from fear of penal responsibility threatening to himself or persons closest to him,

§4

The court may apply an extraordinary mitigation of punishment or even renounce from inflicting the punishment, if:

1. the false testimony concerns circumstances that may not have any influence for the decision in the case, or

2. the perpetrator rectifies the false statement before even invalid decision in the case is issued.

Regulations of the Act "Protection of the economical turnover and alteration of some provisions of the Penal Law" of 12th Oct. 1994, published in the Official Journal of Acts of 30th Nov. 1994 No. 126, pos. 615



§3

If the perpetrator commits the deed described in §1
or §2, acting in conspiracy with other persons or with
the help of such deed wins considerable proprietal
profits,

is liable to imprisonment from one year till 10
years

§4

Is not liable to penalty for offense described in §1-3,
who voluntarily revealed with the agency appointed
for prosecution of offenses, information concerning
persons participating in commission of offenses and
circumstances of its commission, if it prevented
commission of another offense, if the perpetrator
was straining himself to reveal this information and
circumstances

then the court applies extraordinary mitigation
of punishment

§5

In case of conviction for offense described in §1-3,
the court predicates forfeiture of objects originating



directly or indirectly from the offense, without exclusion of legal tenders, securities and currency values. If these objects are nor property of the perpetrator – the court may predicate their forfeiture

For conformity

(Seal)

Prosecutor

of the Provincial Prosecutor's Office

in Warsaw

(-)

Grażyna Łoniewska, M.Sc.

                              (Round seal)

                    Provincial Prosecutor's Office

                                    in Warsaw



IE

Republic of Poland
Ministry of Justice
National Prosecutor's Office
Office of Preparatory Proceedings
Al. Ujazdowskie 11
00-950 Warsaw, PO Box 33
Tel. (Dir.) 628-44-31

Warsaw, 24th Feb. 1998

Our ref. PR II Oz 585/98

OFFICE OF INTERNATIONAL
AFFAIRS
CRIMINAL DIVISION
DEPARTMENT OF JUSTICE

Bond Building
Suite 5100
1400 New York Avenue, N.W.
Washington D.C. 2005

Enclosed please find the request of the
Provincial Prosecutor in Warsaw No. VI Ds 61/97 for
legal assistance in the case of money laundering -
with a kind request for its execution.

In response please quote the number PR I Oz
4133/97

With best regards

Chief of the Department for Foreign Legal Relations
(-) Kornel Socha

i.A. Hanka Krukar
Prosecutor of the Appellation Prosecutor's Office
Delegated to the Ministry of Justice

(Round seal: Ministry of Justice)



- 2 -

nia i nie prowadzi w Polsce oficjalnej działalności gospodar-
czej.

W dniu 10 października 1996 roku na rachunek Alexeia Bragont-
chouka wpłynęła kwota 500.000 dolarów amerykańskich przekazana
przelewem telegraficznym z firmy "Intora Ltd" poprzez Banco
Exterior de Espana w Londynie. Tego samego dnia - 10 paździer-
nika 1996 roku wpłynęła druga depesza swiftowa typu MT 100,
z 9 października 1996 roku w kwocie 3.500.000 dolarów USA na
rachunek Bragontchouka.
Łącznie w dniu 9 października 1996 roku firma "Intora Ltd"
przelała z Banco Exterior de Espana w Londynie kwotę 4.000.000
dolarów USA na konto prywatnej osoby - Alexeia Bragontchouka,
który założył sobie rachunek w polskim banku i jak wynika z
analizy dat i operacji na tym rachunku, założył go w celu
przejęcia i wywiezienia z Polski w formie gotówki i przelewów
na nie swoje konto 4.000.000 USD przesłanych przez "Intorę"
z Wielkiej Brytanii.

Z formalnego punktu widzenia Alexei Bragontchouk nie naruszył
prawa, gdyż założył rachunek zgodnie z przepisami, uzyskiwał
zaświadczenia o wywozie dewiz lub dawał dyspozycje o przele-
wach na swoje konto w Banku "Victoria Mołdawia" w Kiszyniowie
oraz zlecał przelewy: 92.200 USD, 20.01.1997 roku na rachunek
EB SHiPPiNG Corporation Bank Details, 1.900.000 USD na rachu-
nek "Pandora Ventures Ltd" w Centralnym Banku Europejskim w
Budapeszcie.
W gotówce Bragontchouk wywiózł z Polski do dnia 11 lipca 1997
roku kwotę 1.230.000 USD.

Do Polski Bragontchouk przylatywał na czas realizacji czynnoś-
ci bankowych, czas pobytu wynosił 1 dzień.

W dniu 27 marca 1997 roku Bragontchouk złożył wniosek w banku,
w którym prostuje pisownię swojego nazwiska, które ma brzmieć:
Alexei Braganciuc, urodzony 26.06.1960, syn Michaiła.
Braganciuc zadysponował też, aby pieniądze do banku w Mołdawii

przelewać za pośrednictwem "Chase Manhattan Bank Brooklyn New York.

W banku Gospodarki Żywnościowej SA w Warszawie posiada także swój rachunek firma "Teasdale Ltd" zarejestrowana w Dublinie. Firma nie prowadzi działalności w Polsce i jak wynika z dotychczasowych ustaleń śledztwa nie ma biura ani faktycznej siedziby.

Rachunkami bankowymi "Teasdale" w Polsce dysponuje ustanowiony pełnomocnik Jacek Wypych posiadający miejsce zamieszkania w Polsce i prawo stałego pobytu w USA oraz Marian Piszcz, obywatel polski zamieszkały w Polsce.

Elementem, który połączył w śledztwie Alexeia Bragonciuc i "Teasdale" był fakt, że dnia 15 października 1996 roku na rachunek firmy "Teasdale" w BGŻ wpłynęły kwoty: 816.100 USD od "Intora Ltd" oraz 19 czerwca 1997 r. - 3.328.936 USD też z firmy "Intora".

"Teasdale" nie prowadzi działalności w Polsce, ale ma kilka rachunków bankowych, gdzie odbywają się ruchy środków finansowych.

Spółka "Intora Ltd" zgodnie z oficjalnymi dokumentami, została zarejestrowana dnia 1 listopada 1994 roku w Anglii, numer rejestru 02985086.

Ostateczną spółką holdingową dla "Intora" jest Consolidated International Holdings, zarejestrowana w Panamie. O holdingu w Panamie nie wiemy nic poza tym, że Intora Treves Association dokonała przelewu w kwocie 1.344.980 USD na rachunek "Teasdale" w polskim banku.

"Intora Treves Association" jest spółką holdingową zarejestrowaną w Panamie.

"Intora Ltd" zarejestrowana w Anglii przez Companies House 2ND Floor Romy House 159-167 King Road Brentwood, Essex.

Dyrektorami "Intora Ltd" w Wielkiej Brytanii, są NIcholas Sellars, Peter Jeney - obywatel Szwajcarii i Brian Charles Nalborough, Milivoy Relijn - obywatel Jugosławii.

- 4 -

Łącznie od 9 października 1996 roku, na zlecenie firmy
"Intora Ltd" w Anglii, przelano na rachunki "Teasdale" w Pol-
sce, spółki "Tranmoss" i obywatela Mołdawii Alexeia Bragon-
ciuc łączną sumę conajmniej 5.718.958 USD.
Jest to wartość zleceń tylko na rachunki w jednym banku -
Gospodarki Żywnościowej.

Firma "Intora Ltd" prawdopodobnie zajmuje się handlem bronią
o międzynarodowym zasięgu. Zachodzi w pełni uzasadnione podej-
rzenie, że celem zleceń płatniczych "Intora" do polskich ban-
ków jest "pranie pieniędzy".

Ponieważ dla udowodnienia konkretnym osobom, udziału w "praniu
brudnych pieniędzy" konieczne jest udokumentowanie pochodzenia
środków finansowych na przykład z handlu bronią, konieczne
jest ustalenie źródeł pochodzenia środków finansowych "Intory"
oraz ustalenie organizacji przestępczego procederu dla wyło-
nienia osobowego ośrodka decyzyjnego.

Z dotychczasowych ustaleń śledztwa wynika, że mechanizm dzia-
łania jest następujący: środki finansowe przesyłane do pol-
skich banków trafiają na rachunki osób lub firm, które w Pol-
sce nie prowadzą działalności gospodarczej, ale dysponują kil-
koma rachunkami bankowymi tych firm.
Następnie środki te zostają poddane wielokrotnym transferom
pomiędzy innymi rachunkami firm obcych, które mają tylko ra-
chunek bankowy w Polsce i następnie zostają odwrotnie prze-
syłane za granicę, pod różnymi pretekstami, o ile tytuł płat-
ności w ogóle jest określony.
Transfery pomiędzy spółkami zagranicznymi, o których niżej,
nie mają logicznego uzasadnienia gospodarczego, pozbawione są
sensu ekonomicznego. Wygląda to na typowy mechanizm "prania
pieniędzy".

Firmy pomiędzy którymi transferowane są w Polsce środki finan-
sowe przesyłane przez "Intora" do Polski i z Polski za grani-
cę RP, to:

- 5 -

- AMRON LTD - zarejestrowana w 1992 roku w USA, adres firmy:
  Paul Podedworny, 417 Huber Lane Glenview Ill 60025, Bank
  American National

- Banner AG - zarejestrowana w 1992 r. w Vaduz Lichtenstein,
  Alute str 5 FL-8490. Właścicielem konta w polskim banku
  jest Jacek Wypych i Marian Piszcz - pełnomocnikiem

- Teasdale Ltd - zarejestrowana w 1995 r. w Dublinie, Irlandia
  z siedzibą 41 Central Chambers Dame Court Dublin 2.
  Brak danych o banku w Anglii lub Irlandii. Kontami firmy
  w polskich bankach dysponuje pełnomocnik Jacek Wypych

- Tranmoss - założona w Irlandii w 1996 r. rachunkiem w Polsce
  dysponuje Henryk Chmielewski i Marian Piszcz,

- Concors Inc. - zarejestrowana w 1996 r. na Wyspach Dziewi-
  czych, Tortola Palm Chambers.

Chcielibyśmy wiedzieć, czy wyżej wymienione firmy prowadzą
działalność gospodarczą na terenie Stanów Zjednoczonych
Ameryki, a jeśli tak, to czym się zajmują i w jakim banku
posiadają rachunek te firmy.
Prosimy o ustalenie rodzaju i celu wzajemnych związków finan-
sowych i osobowych tych firm z firmą "Intora Ltd".
Niniejsze ustalenia mogą dostarczyć istotnych faktów, świad-
czących o pochodzeniu znacznych środków, które zawsze wystę-
pują na wszystkich rachunkach w walucie dolara amerykańskiego.
Mamy też na uwadze, że ustalenia, o które prosimy pozwolą wy-
łonić właściciela "wypranych pieniędzy".

Prosimy o dokonanie i przekazanie następujących ustaleń i doku-
mentów:

I) z informacji wstępnej uzyskanej z Biura Łącznikowego FBI
   w Warszawie wiemy, że w USA były zarejestrowane dwie firmy
   o nazwie "Intora", które w obecnej chwili podobno nie dzia-·

- 6 -

Zachodzi uzasadnione podejrzenie, wynikające ze zbieżności
nazw, zbieżności dat i miejsca położenia, że "Intora Ltd"
w Anglii lub holding "Intora" w Panamie, dysponują tymi
samymi środkami finansowymi, które należały i w jakiś spo-
sób zniknęły na przykład z powodu oszustw podatkowych z
"Intory" w Stanach Zjednoczonych:

1) "Intora" SA, Inc.
   350 Lincoln RD, Suite 501
   Miami, Floryda 33139
   Osobą założycielką była Rochelle Mea Malek.
   Firma podobno rozwiązana 16 listopada 1987 roku.

2) "Intora" Holdings Inc. Stan Texas
   od 14 lutego 1995 r. status firmy jest "martwy", z uwagi
   na konfiskatę za nieopłacone podatki.
   Przedstawicielem prawnym tej firmy był Bailey, Shaw and
   Deadman, PC 314 East Commerce, Suite 400
   San Antonio, Texas 78205
   Osoba rejestrująca firmę Marilyn S.Hershman Austin,
   Texas USA.

Prosimy o następujące dokumenty odnośnie obu firm "Intora",
działających w USA:

- wypis z rejestru firm, dane o kapitale założycielskim,
  udziałowcach, pracownikach i przedmiocie działania oraz
  przyczynach rozwiązania "Intora"SA Inc, rozwiązanej dnia ·
  16.11.1987 roku.
  W jakich bankach firma posiadała rachunki i czy na dzień
  dzisiejszy rachunki te są zlikwidowane, czy też istnieją
  jako czynne,

- dokumenty rejestrowe firmy "Intora" Holdings Inc. działa-
  jącej do 14.02.1995 roku w Texasie, statut, lista udziałow-
  ców oraz przedmiot i przyczyna konfiskaty przez władze.
  Czy fiskus zaspokoił się z konfiskaty majątku firmy, czy
  też było tak, że jakiś kapitał "zniknął" na przykład umie-

- 7 -

jętnie ukryty poza Stanami Zjednoczonymi. Jaki był rozmiar
finansowy tej zaległości.

Nie można wykluczyć, że nie jest przypadkiem fakt, że niektóre
przelewy pieniędzy "Intory Ltd" w Wielkiej Brytanii przekaza-
nych na rachunki wymienionych firm w polskich bankach, wraca-
jąc natychmiast za granicę Polski trafiają odwrotnie też do
USA, w tym do banku w Texasie, na Florydzie i w Stanie Illinois
i Nowym Jorku.

1) w czerwcu 1997 roku na zlecenie Spółki "Concors Inc."
   zrealizowane przez jej pełnomocnika Mariana Piszcz prze-
   lano 32.035 USD na rachunek numer 622-176-9 Fields Infiniti
   3 Waukegan RD. Glenview Ill. 60025 USA w Harris Bank Winnetka
   N.A. 520 Green Bay RD. Winnetka, IL. 60093 USA,

2) w lipcu 1997 roku "Concors Inc" zleca przelew w kwocie
   25.000 USD na rachunek numer 36035155846 L.O.A. Investments
   2 Clearview AV Hobe Sound, Fl.33455 w Nations Bank 5519
   Idelwild AV, Tampa, FL 33614 (rzekomo za program komputerowy),

3) "Banner AG zleca przelew 136.000 USD we wrześniu 1997 roku
   dla "Amron Ltd" na rachunek w Bloomingdale Bank 150 S.
   Bloomingdale RD. Bloomingdale IL. 60108 USA ABA   071-925-305
   (dysponuje Marian Piszcz z Amer Bank) i 98.000 USD w paź-
   dzierniku 1997, 124.000 USD

4) Spółka "Banner AG" przelew 5.000 USD z rachunku w Amer Bank
   dla Agaty Podedworny Bank Of New York 233 Brodway New York
   N.Y. 10279 ABA-021-000-018 numer konta 6371539334 - dyspo-
   zycje Marian Piszcz,

5) z firmy "Teasdale" przekazano znaczne środki dla Interna-
   tional Inc. 3565 Caminito El Rincon, San Diego CA 92-130 do
   banku Wells Farg Bank Del Mar Mighlands 3445 Del Mar Meights
   Road. Czym zajmuje się właściciel tego rachunku i czy firma
   istnieje i ma powiązania z "Intora" i innymi,

6) w lipcu 1997 roku "Concors Inc." - zlecenie realizowane
   przez Mariana Piszcza, kwota 10.000 USD przekazana na
   rachunek numer 1024277 Fenton Lang Residential Services
   w First United Bank 980 N.Federal Highway Boca Raton FL
   33432 ABA 067013153 (jako prowizja od zakupu nierucho-
   mości).

Prosimy o odpowiedź na następujące pytania:

- czy firma z punktu 6 zajmuje się handlem nieruchomościami
  czy istnieje dalej,

- czym zajmują się adresaci przelewów z firmy "Concors" opisa-
  ni wyżej w punktach 1-5 i czy są to firmy, działające, czy
  osoby prywatne, kto personalnie dysponuje tymi rachunkami
  czyli przede wszystkim czy ktoś odebrał te pieniądze w go-
  tówce, a jeśli tak to kto,

- czy w wymienionych bankach w stanie Illinoi, Floryda miały
  kiedykolwiek lub mają rachunek następujące firmy:

        AMRON

        CONCORS

        TRANMOSS

        BANNER

        TEASDALE

        INTORA

        INVESTMENTS CORUP INC

        ASTON ROTHBURY CREDIT COR

        HOMER

        ASTON TOTHBURY AND CO LTD

        MEDITERRANEAN VILLAS LTD

        GILMOUR

- czy rachunek bankowy Agaty Podedworny jest jej prywatnym
  kontem, czy firmowym, jeśli tak to do kogo należy.

II) czy w bankach amerykańskich takich jak:
    CHASE MANHATTAN BANK BROKLYN NY

- 9 -

BANK OF AMERICA
AMERICAN EXPRESS BANK
BANK BLOOMINGALE
AMERICAN NATIONAL BANK
lub na Wyspach Rajskich i Wyspach Bahama mają rachunki
następujące firmy lub osoby fizyczne:

- AMRON LTD - firma amerykańska. Właścicielami są Paweł
  POdedworny zamieszkały 417 Huber Lane Glenview ILL 60025
  USA oraz Wiesław Michalczyk zamieszkały 438 Shervl LN
  Glenview IL. i zatrudniony w "Amron" Jacek Wypych zamiesz-
  kały w Polsce: Łódź ul.Żurawia 12/27 i w USA

- BELTECHEXPORT - spółka zarejestrowana w Mińsku na Biało-
  rusi z Oddziałem w Polsce. Pełnomocnikiem finansowym w
  Polsce tego oddziału jest Jacek Wypych,

- TRANMOSS LTD - zarejestrowana w Dublinie Irlandia,

- BANNER AG - zarejestrowana w Vaduz Lichtenstein przez
  Wiesława Michalczyka i Jacka Wypycha,

- CONCORS INC - Wyspy Dziewicze

- INVESTMENTS GROUP INC USA Bahama

- TEASDALE LTD - Dublin Irlandia

- EB SHiPPiNG LTD

- GILMOUR

- ASTON ROTHBURY CREDIT COR LTD

‾HOMER LTD

- PANDORA VENTURES - Wyspy Dziewicze

- ASTON TOTHBURY and CO LTD

- MEDITERRANEAN VILLAS LTD

- INTORA LTD lub INTORA TREVES ASSOCIATION

- Jecek Wypych
- Alexei Brgonciuc
- Lew Kozolov

- Petar Stojic
- Mima Jovanovic
- Miloslaw Reljin
- Hashem Maadi
- Paweł Podedworny
- Wiesław Michalczyk
- Marian Piszcz
- Henryk Chmielewski
- Peftiew Aleksander.

III) Kto kieruje w USA oddziałem "Intora Ltd" mieszczącym się
w stanie Texas 2509 Shoreline Drive Abilene Texas 79602.

Proszę przesłuchać dyrektora oddziału "Intora" na okolicz-
ność:

- jaką działalność prowadzi "Intora" w USA, jaki jest cel
istnienia oddziału,

- skąd pochodzą źródła finansowania "Intora Ltd" Oddział
w Texasie i kto wydaje mu polecenia z ramienia firmy,

- gdzie mieści się biuro zarządu "Intora",

- czy otrzymuje gotówkę na działalność oddziału, czy na
rachunek bankowy i od jakich osób,

- kto jest pracownikiem "Intora" w USA.

IV) proszę o przesłuchanie w charakterze świadka pani Marlyn S.
Hershman z Austin w Texas i pani Rochelle Bea Malek z Flo-
rydy, które rejestrowały swoje firmy o takiej samej nazwie
- "Intora" na okoliczność:

- kiedy i z jakiego powodu założyły firmę o nazwie "Intora"

- co było celem i przedmiotem działania firmy,

- jak długo firma funkcjonowała,

- jaki był kapitał założycielski firmy, skąd pochodził
i od kogo, kto był udziałowcem lub akcjonariuszem i właś-

- 11 -

cicielem firmy,

- co spowodowało, że firma nie funkcjonuje,

- czy jest możliwość podjęcia dzialności gospodarczej, jaki
  ma dług wobec władz podatkwoych lub wobec innych podmio-
  tów,

- jakie zyski i dochody firma osiągnęła,

- czy w swojej działalności kooperowali z partnerami
  w Europie,

Przesłuchać w charakterze świadka RONA ROCHESTER urzędnika
bankowego prowadzącego rachunek firmy "Amron" w American
National Bank 4159 Old River Road Schiller Park, ILL 60176
na okoliczność:

- od kiedy "Amron" ma rachunek w American National Bank,

- jakie są roczne obroty na rachunku, czy firma zachowuje
  płynność kredytową,

- jakie są źródła wpływów "Amron", jaką prowadzi działalność,

- czy "Amron" ma inne rachunki bankowe, czy ma oddziały,
  gdzie,

- z jakich państw, firm lub od osób prywatnych wpływały
  przelewy, czy były przelewy z "Intora" jeżeli tak proszę
  zabezpieczyć dokumenty,

- czy "Amron" transferował środki finansowe poza granice
  USA lub wzajemnie pomiędzy firmami, które mają rachunki
  w amerykańskich bankach,

- kto personalnie dysponuje rachunkiem "Amron", kto wydaje
  dyspozycje bankowe,

- czy osobami tymi są właściciele firmy, czy pracownicy,

- z jakim kapitałem rozpoczął funkcjonowanie rachunek,
  chodzi o podanie pochodzenia dwóch pierwszych wpłat
  i analizę historii rachunku "Amron" szczegónie za lata
  1995,1996-1997,

- czy jest wiadomo mu w jakich bankach i ile rachunków
  firma "Amron" posiada w Polsce, czy przedstawiał ocenę
  finansową firmy dla polskich banków,

- czy wpływały pieniądze z firm Banner, Teasdale, Tranmoss,
  Concors, Intora, Pandora, a jeśli tak to z jakich rachun-
  ków.

Nadto prosimy o ustalenie gdzie mieści się biuro "Amron Ltd"
i kto jest pracownikiem tej firmy.
Prosimy o uzyskanie kopii protokołów posiedzeń zarządu lub
innego dokumentu firmy, w którym "Amron" powierza obowiązki
pełnomocników do dysponowania rachunkami "Amron", które ma
firma w USA, w Polsce i innych krajach.
Sprawdzić, czy wynika z dokumentów, że pracownicy firmy
otrzymują wynagrodzenie za pracę. Zabezpieczyć kopię doku-
mentu z którego wynika, kto pobiera wynagrodzenie pracow-
nika "Amron".
Ile oddziałów posiada "Amron" i w jakich krajach.
W jakich firmach na świecie "Amron" zainwestował, wykupując
udziały w spółkach.

V) ustalenia o które prosimy mają doprowadzić nie tylko do
   wyjaśnienia pochodzenia pieniędzy "Intora", ale także zmie-
   rzamy do prześledzenia ich drogi, aby dowieść kto "wyprane"
   już pieniądze, przesłane z Polski odbiera i wykorzystuje.

Jacek Wypych pobierając gotówkę z kont spółek wymienionych
już we wniosku w polskich bankach, wywozi je również z Pol-
ski do różnych państw świata w postaci gotówki.
Przewozi gotówkę (na przykład 488.000 USD) z "Intory"
w Londynie dla nieustalonego odbiorcy. Poza miejscem za-
mieszkania w Polsce Jacek Wypych mieszka w Stanach Zjedno-
czonych, często przylatuje do Chicago i udaje się stamtąd
na Wyspy Rajskie.

Proszę o ustalenie, czy lokuje tam środki finansowe na
rachunkach firm: "Tranmoss", "Intora", "Teasdale", "Amron",

- 13 -

"Concors", Banner", "Beltexexport lub swoim prywatnym.
Możliwe, że Jacek Wypych na Wyspach Rajskich ma inną swoją
firmę.

Kwota pięciu milionów dolarów, która jest przedmiotem
postępowania przygotowawczego w chwili obecnej to niewiel-
ka część obrotów jakie faktycznie mają miejsce z zastoso-
waniem opisanego mechanizmu, który polega na tym, że pie-
niądze przelewane są na rachunki firm w polskich bankach
przez "Intora" i inne, a następnie transferowane pomiędzy
sobą i różnymi rachunkami w różnych bankach polskich, wra-
cają za granicę drogą też przelewów bankowych lub wywożo-
ne w postaci gotówki (przeważnie po 100.000 - 500.000 USD)
przez osoby fizyczne, które są ustanowione pełnomocnikami
firm.
Faktycznie rozmiar tej działalności przekroczył granicę
15 milionów USD.

Prosimy o ustalenie czy wymienione niżej osoby przekraczały
granicę USA w latach 1989-1997 i czy zachodzą między nimi
związki podmiotowe lub przedmiotowe w odniesieniu do dzia-
łalności gospodarczej wymienionych spółek oraz które z tych
osób ma prawo stałego pobytu w USA, czy posiadają ubezpie-
czenie w USA:

1) Jacek Wypych - zamieszkały w Polsce i USA: ostatnio
   140 Boardwalk Park Ridge Il 60068, urodzony 23 lutego
   1951 roku w Łodzi, syn Waldemara i Ireny.

2) Paweł Podedworny - urodzony 7.08.1950 roku w Warszawie
   syn Henryka i Stefanii, pobyt stały w USA.
   Numer paszportu polskiego: AA 6765606
   Numer paszportu amerykańskiego 023284683

3) Wiesław Michalczyk - urodzony 2.04.1959 roku w Warszawie
   syn Stanisława i Marianny, pobyt stały w USA
   Numer paszportu polskiego AA 4487674

_ 14 _

Numer paszportu amerykańskiego 24907425

4) Peter Jeney - urodzony 13.09.1940 roku obywatel Szwajcarii

5) Henryk Chmielewski - zamieszkały w Polsce - Kalisz
   urodzony 13 czerwca 1928 roku w Kaliszu syn Michała
   i Aleksandry,

6) Marian Piszcz - urodzony 30 października 1955 roku
   w Mińsku Mazowieckim, syn Mariana i Władysławy

7) Zbigniew Tolak - urodzony 16.12.1951 roku w Warszawie,

8) Charles Nalborough - obywatel Wielkiej Brytanii
   dyrektor "Intora Ltd"

9) Alexei Bragontchouk lub Bragonciuc - urodzony 26 czerwca
   1960 roku - obywatel Mołdawii.

Prosimy także o ustalenie jaką działalność gospodarczą lub
zawodową prowadzą w USA Agata i Paweł Podedworny oraz Wiesław
Michalczyk, a szczególnie jakie są ich ujawnione dochody od
których płacą podatki i jakie jest ich źródło, czy są zatrudnie-
ni w amerykańskich firmach.

Zwróciliśmy się z wnioskiem o pomoc prawną do Wielkiej Brytanii
i przed wykonaniem zaplanowanych czynności w drodze pomocy praw-
nej na terenie Wielkiej Brytanii, nie można sprecyzować wnios-
ków, co do przesłuchań Wiesława Michalczyka i Pawła Podedwor-
nego. Z całą pewnością będzie konieczność ich przesłuchania
i nie można wykluczyć, że odbędzie się to w USA, ale dziś z
uwagi na taktykę śledztwa nie można podjąć decyzji, co do for-
my, terminu i zakresu przesłuchań Wiesława Michalczyka i Pawła
Podedwornego.
Wiesław Michalczyk i Paweł Podedworny mają w Polsce miejsce
zameldowania i podróżują do Polski i innych krajów posługując
się paszportami polskim lub amerykańskim.

- 15 -

Jednocześnie proszę o dopuszczenie do udziału w czynnościach
polskiego prokuratora.

Przesłuchiwanych w charakterze świadków należy poinformować,
że zgodnie z treścią artykułu 247 paragraf 1 polskiego kodeksu
karnego składanie nieprawdziwych zeznań i zatajanie prawdy
jest przestępstwem zagrożonym karą pozbawienia wolności do lat
pięciu.

Przepisy polskiego kodeksu karnego, kodeksu postępowania kar-
nego i ustawy "O ochronie obrotu gospodarczego" i zmianie nie-
których przepisów prawa karnego z dnia 12.10.1994 roku Dzien-
nik Ustaw numer 126 z 1994 roku w załączniku numer 1 i 2.

Z wyrazami głębokiego szacunku

A. Przepisy polskiego kodeksu karnego


Artykuł 247 paragraf 1 Kto, składając zeznanie mające służyć
za dowód w postępowaniu sadowym lub innym postępowaniu
prowadzonym na podstawie ustawy, zeznaje nieprawdę lub zataja
prawdę, podlega karze pozbawienia wolności do lat 5,


paragraf 2 Warunkiem odpowiedzialności jest, aby przyjmujący
zeznanie, działając w zakresie swych uprawnień, uprzedził
zeznającego o odpowiedzialności karnej za fałszywe zeznanie
lub odebrał od niego przyrzeczenie,


paragraf 3 Nie podlega karze, kto nie wiedząc o prawie odmowy
zeznania lub odpowiedzialności na pytania, składa sfałszywe
zeznanie z obawy przed odpowiedzialnością karną grożącą jemu
samemu lub jego najbliższym,


paragraf 4 Sąd może zastosować nadzwyczajne złagodzenie kary,
a nawet odstąpić od jej wymierzenia, jeżeli :

1) fałszywe zeznanie dotyczy okoliczności nie mogących mieć
   wpływu na rozstrzygnięcie sprawy albo

2) sprawca sprostuje fałszywe zeznanie, zanim nastąpi, chociażby
   nieprawomocne, rozstrzygnięcie sprawy.

B. Przepisy ustawy " O ochronie obrotu gospodarczego i
   zmianie niektórych przepisów prawa karnego " z dnia 12
   października 1994 roku opublikowane w Dzienniku Ustaw
   z dnia 30 listopada 1994 roku numer 126 pozycja 615

Artykuł 5 paragraf 1 Kto w celu wprowadzenia do legalnego obrotu
środków płatniczych, papierów wartościowych lub wartości
dewizowych pochodzących ze zorganizowanej przestępczości,
powiązanej z obrotem środkami odurzającymi lub psychotropowymi,
fałszowaniem pieniędzy lub papierów wartościowych, wymuszeniem
okupu labo handlem bronią, przyjmuje je, przenosi własność

lub posiadanie, przekazuje lub wywozi za granicę albo podejmuje
inne działania, które może udaremić stwierdzenie ich
przestępnego pochodzenia, wykrycie albo orzeczenie przepadku,
podlega karze pozbawienia wolności od 6 miesięcy do lat 5,

**paragraf 2** Kto wbrew przepisom przyjmuje w gotówce wielkie
ilości pieniędzy lub wartości dwizowych albo pieniądze lub
wartości dewizowe przyjmuje w okolicznościach uzbudzających
uzasadnione podejrzenie ich pochodzenia ze zorganizowanej
przestępczości albo świadczy usługi w zatajeniu ich
przestępnego pochodzenia lub w zabezpieczeniu przed zajęciem,
podlega karze pozbawienia wolności do lt 3,

**paragraf 3** Jeżeli sprawca dopuszcza się czynu określonego w
paragrafie 1 lub 2 działając w porozumieniu z innymi osobami
lub za pomocą takiego czynu osiąga znaczną korzyść majątkową,
podlega karze pozbawienia wolności od roku do lat 10,

**paragraf 4** Nie podlega karze za przestępstwo określone w
paragrafie 1 - 3, kto doprowolnie ujawnił wobec organu powoła-
nego do ścigania przestępstw informacje dotyczące osób uczestni-
czących w popełnieniu przestępstwa oraz okoliczności jego
popełnienia, jeżeli zapobiegło to popełnieniu innego
przestępstwa, jeżeli sprawca czynił starania zmierzające do
ujawnienia tych informacji i okoliczności, sąd stosuje nad-
zwyczajne złagoszenie kary,

**paragraf 5** W razie skazania za przestępstwo określone w
paragrafie 1 - 3, sąd orzeka przepadek przedmiotów pochodzą-
cych bezpośrednio lub pośrednio z przestępstwa nie wyłączając
środków płatniczych, papierów wartościowych i wartości
dewizowych. Gdy przedmioty te nie są własnością sprawcy -
sąd może orzec ich przepadek.

**Za zgodność :**   

P R O K U R A T U R
Pkuratury Wojewódzkiej
w Warszawie

*mgr Grażyna Koniewska*

Republic of Poland

Ministry of Justice

National Prosecutor's Office

Office of Preparatory Proceedings

Al. Ujazdowskie 11

00-950 Warsaw, PO Box 33

Tel. (Dir.) 628-44-31

Warsaw, 21.10.1998

Our ref. PR II Oz 585/98/P


OFFICE OF INTERNATIONAL AFFAIRS

CRIMINAL DIVISION

DEPARTMENT OF JUSTICE

Bond Building

Suite 5100

1400 New York Avenue, N.W.

Washington D.C. 2005

SUPP.
INFO.



In reference to your letter of 19th August 1998 No. 182-10264 please be informed that the fact itself of instigating the investigation, and then directing the request for legal assistance in a criminal matter, testifies that there is a justified suspicion of a certain

infringement of the Polish law, of which we wrote in our request.

According to Polish regulations, the weapon trade may be legal if it is carried out on the basis of a certain concession, issued by the relevant Ministry, what allows thus the legal special circulation by the given company.

A foreign company that deals with special circulation in its country may not use the territory of Poland for intermediation, e.g. through a branch office or a filial, without any valid concession. When we speak of weapon trade, we mean the illegal form of this activity.

According to disposition of the Art. 299 §1 of the Penal Code, whoever accepts currency assets, coming from benefits connected with commission of a crime, in particular consisting in weapon trade, transmits or brings abroad, helps in transmitting their ownership, possession or undertakes other actions that could bring to nought or make seriously difficult stating their criminal origin or location and recovery, is liable to punishment (the regulations see enclosed).



Actions of Alexei Bragontchouk satisfy all features of the crime, provided in Art. 299 §1 of the Penal Code. As it results from description in the request, Alexei Bragontchouk (Braganciuc) opened an account in the Polish bank Bank for Food Economy BGŻ, having the knowledge of the transfer of 4.000.000, - USD from Intora Ltd. in Great Britain.

The company Intora Ltd., acting as a part of a group of companies in Europe, deals with weapon trade, and this activity is not its official and legal business in the Great Britain. Intora Ltd. does not lead activity in Poland either.

After having received the transfers for 4.000.000,- USD, Braganciuc executes at least one payment for the benefit of another company, EB Shipping, which according to our knowledge received from the law enforcement organs of other countries, deals with weapon and weaponry elements trade and belongs in Europe to several reckoned partners in this illegal circulation.

It is also known that the area of traders' activity is not Europe itself, but the whole world as well.

It can not be interpreted as a coincidence that Braganciuc receives from "Intralid" a considerable



amount and pays for something to another company, dealing with weapon trade. Contacts with such subjects require initiation into secrets and confidence in the group of people who deal with weapons.

Alexei Braganciuc has never lived or worked in Poland. Moreover the analysis of Braganciuc' account turnover indicates that the account in a Polish bank he had opened in the purpose of concealing the transactions and to make it difficult to state the origin of this money, because after having received the 4.000.000,- USD he gradually spent the monies, transmitting it through transfers to his account in Kishyniov, carried currency assets abroad in cash or executed payment orders.

After having been exhausted from the sum of 4.000.000,- USD the account stopped its activity. There arises the fully justified suspicion that we have here to do with "money laundering".



Actions carried out by us in the investigation, also on the way of the legal assistance in other countries of Europe and America, aim to proving the fact of commission of the crime from Art. 299 §1 of the Penal Code by Braganciuc.

5

Difficult is the documentation of the source and origin of the said 4.000.000,- USD, but in co-operation with law enforcement agencies of other countries we may be able to make it.

"Money laundering" is dangerous, and the United States have beyond any doubt the greatest experience in fighting this category of crimes.

Our determinations indicate that Alexei Braganciuc used the Polish banking system for commission of a crime, without infringing the banking regulations.

The regulations of the banking law in Poland may not be fully perfect, but they provide the duty of informing the law enforcement agencies of transactions arousing suspicions of "money laundering".

While forwarding the above determinations we remain in hope that our request for assistance in this matter shall be executed.



With best regards

Chief of the Department for Foreign Legal Relations

(-) Kornel Socha

(Round seal: Ministry of Justice)

Enclosure No. 1

Excerpt from regulations of the law of 6th June 1997,

Penal Code (Official Journal of Laws of 2nd August

1997, No. 88, pos. 553).


Art. 5

Polish criminal law is applied to the perpetrator, who

committed a forbidden deed on the territory of the

Republic of Poland, as well as on board of a Polish

watership or airship, provided that it is not decided

otherwise by any international agreement, a party of

which is the Republic of Poland.


Art. 299 §1

Whoever accepts legal tenders, valuables, or other

currency values, coming from benefits connected

with commission of a crime by other persons, in

particular consisting in production or turnover with

stupefacients or psychotropic means, smuggle,

money or securities forgery, banditry or commission

of any other crime against property of great value,

forcing ransom or trade with weapons, ammunition,

explosives or radioactive materials, transmits or



brings abroad, helps in transmitting their ownership, possession or undertakes other actions that could bring to nought or make seriously difficult stating their criminal origin or location and recovery, arrestation or resolution of confiscation,

is liable to imprisonment from 3 months till 5 years.


For conformity:

Prosecutor

of the Provincial Prosecutor's Office

in Warsaw

(-) Grażyna Łoniewska, M.Sc.

Round seal:

Provincial Prosecutor's Office

in Warsaw



RZECZPOSPOLITA POLSKA
MINISTERSTWO SPRAWIEDLIWOŚCI
PROKURATURA    KRAJOWA
°     **BIURO**
**POSTĘPOWANIA PRZYGOTOWAWCZEGO**
Al. Ujazdowskie 11
00-950 WARSZAWA  Skr. Poczt. 33
Centrala tel. 628-44-31

Warszawa, dnia    *21. 10*        1998 r.

PR II Oz 585/98/P

**Office of International Affoirs**

**Criminal Division**

**Departament of Justice**

**Bond Building, Snite 5100**

**1400 New York Avenue, N.W.**

**Washington, D.C. 205 30**

W nawiązaniu do Waszego pisma z dnia 19 sierpnia 1998 roku numer 182 - 10264 uprzejmie informuję, iż sam fakt wszczęcia śledztwa, a następnie skierowania wniosku o udzielenie pomocy prawnej w sprawie karnej, świadczy o tym, że zachodzi uzasadnione podejrzenie konkretnego naruszenia polskiego prawa, o którym pisaliśmy we wniosku.

Według polskich przepisów handel bronią może być legalny, jeżeli odbywa się na podstawie koncesji jaką wydaje właściwe Ministerstwo, dopuszczając w ten sposób do legalnego obrotu specjalnego, przez dane przedsiębiorstwa.

Firma zagraniczna, która zajmuje się obrotem specjalnym w swoim kraju, nie może wykorzystywać terytorium Polski do pośredniczenia np. w ramach oddziału lub filii, bez ważnej koncesji. Mówiąc o handlu bronią chodzi o nielegalną formę tej działalności.

Zgodnie z dyspozycją artykułu 299 paragraf 1 kodeksu karnego, kto środki dewizowe, pochodzące z korzyści związanych z popełnieniem przestępstwa w szczególności polegającego na handlu bronią przyjmuje, przekazuje lub wywozi za granicę, pomaga do przenoszenia ich własności, posiadania albo podejmuje inne czynności, które mogą udaremnić lub znacznie

2

utrudnić stwierdzenie ich przestępczego pochodzenia lub miejsca umieszczenia, ich wykrycia podlega karze (całość treści przepisów w załączniku).

Działanie Alexeia Bragontchouka wyczerpuje wszystkie znamiona przestępstwa wymienione w artykule 299 paragraf 1 kodeksu karnego.

Jak wynika z opisu we wniosku, Alexei Bragontchouk (Braganciuc) założył rachunek w polskim Banku Gospodarki Żywnościowej, wiedząc o przekazie 4.000.000 USD z INTORA.LTD w Wielkiej Brytanii.

Firma INTORA LTD działająca jako część grupy przedsiębiorstw w Europie zajmuje się handlem bronią i nie jest to oficjalna i legalna działalność w Wielkiej Brytanii. INTORA LTD w Polsce też nie prowadzi działalności.

Po otrzymaniu przelewów na 4.000.000 USD Braganciuc realizuje co najmniej jedną płatność dla innej firmy EB SHIPPING, która według naszej wiedzy uzyskanej od organów ścigania innych państw zajmuje się handlem bronią i elementami uzbrojenia i należy w Europie do kilku z liczących się partnerów w tym nielegalnym obrocie.

Wiadomo, też że obszar działań handlarzy to nie tylko Europa, ale cały świat.

Nie można interpretować jako przypadek faktu, że Braganciuc otrzymuje od „INTRALID" znaczną kwotę i płaci za coś innej firmie handlującej bronią. Kontakty z takimi podmiotami wymagają wtajemniczenia i zaufania w gronie ludzi, którzy bronią handlują.

Alexei Braganciuc nigdy w Polsce nie pracował i nie mieszkał. Nadto analiza obrotów na rachunku Braganciuc wskazuje, że konto w polskim banku założył w celu ukrycia transakcji i utrudniania wykrycia pochodzenia tych pieniędzy, gdyż po otrzymaniu 4.000.000 USD stopniowo wydał te pieniądze wysyłając je przelewem na swój rachunek w Kiszyniowie, wywoził środki dewizowe w gotówce lub realizował zlecenia płatnicze.

Po wyczerpaniu kwoty 4.000.000 USD rachunek przestał funkcjonować. Zachodzi w pełni uzasadnione podejrzenie, że mamy do czynienia z „praniem brudnych pieniędzy".

Czynności, które realizujemy w śledztwie, także w drodze pomocy prawnej w innych krajach Europy i Ameryki zmierzają do udowodnienia faktu popełnienia przestępstwa z artykułu 299 paragraf 1 kodeksu karnego przez Braganciuca.

Trudność stanowi udokumentowanie źródła i pochodzenia 4.000.000 USD, ale przy współpracy z organami ścigania innych państw może nam się to udać.

„Pranie brudnych pieniędzy" jest zjawiskiem niebezpiecznym, a Stany Zjednoczone mają niewątpliwie największe doświadczenia w zwalczaniu tej kategorii przestępstw.

Ustalenia śledztwa wskazują, iż Alexei Braganciuc wykorzystał polski system bankowy do popełnienia przestępstwa, z zachowaniem przepisów prawa bankowego.

Przepisy prawa bankowego w Polsce może nie są do końca doskonałe, ale przewidują obowiązek informowania organów ścigania o transakcjach, które budzą podejrzenia jako „pranie brudnych pieniędzy".

Przekazując powyższe ustalenia, pozostajemy w nadziei, iż zostanie zrealizowany nasz wniosek o udzielenie pomocy prawnej w tej sprawie.

Z wyrazami szacunku

Naczelnik Wydziału
Obrotu Prawnego z Zagranicą

Kornel Socha

alp

Załącznik numer 1

Wyciąg z przepisów ustawy z dnia 6 czerwca 1997
roku Kodeks Karny ( Dziennik Ustaw z dnia 2
sierpnia 1997 roku, numer 88, pozycja 553 )

**Artykuł 5**

Ustawę karną polską stosuje się do sprawcy, który popełnił
czyn zabroniony na terytorium Rzeczypospolitej Polskiej, jak
również na polskim statku wodnym lub powietrznym, chyba że
umowa międzynarodowa, której Rzeczpospolita Polska jest
stroną, stanowi inaczej.

**Artykuł 299 paragraf 1**

Kto środki płatnicze, papiery wartościowe lub inne wartości
dewizowe, prawa majątkowe albo mienie ruchome lub nieruchome,
pochodzące z korzyści związanych z popełnieniem przestępstwa
przez inne osoby, w szczególności polegającego na wytwarzaniu
lub obrocie środkami odurzającymi lub psychotropowymi, przemycie
fałszowaniu pieniędzy lub papierów wartościowych, rozboju albo
popełnieniu innego przestępstwa przeciwko mieniu wielkiej
wartości, wymuszaniu okupu albo handlu bronią, amunicją lub
materiałami wybuchowymi albo rozszczepialnymi, przyjmuje, prze-
kazuje lub wywozi za granicę, pomaga do przenoszenia ich włas-
ności lub posiadania albo podejmuje inne czynności, które mogą
udaremnić lub znacznie utrudnić stwierdzenie ich przestępnego
pochodzenia lub miejsca umieszczenia, ich wykrycie, zajęcie
albo orzeczenie przepadku, podlega karze pozbawienia wolności
od 3 miesięcy do lat 5.

Za zgodność :



